Merdie B. Edwards, Individually and as Executrix of the Will of Lawrence H. Edwards vs. John E. Walker, et al.

Eq. No. 11870.

May 3, 1933.

CHURCHILL, J. Heard on bill, answers and proofs.

The bill was filed by Merdie B. Edwards, individually and as executrix of the will of Lawrence H. Edwards, against Edwards & Walker, Inc., a corporation, and against its officers, John E. Walker and E. Raymond Walsh.

Lawrence H. Edwards, the husband of the complainant, and John E. Walker, one of the respondents, entered into a partnership in 1913 in the meat and produce business in the City of Providence. In 1914, one William H. Virgin was taken into the firm. He withdrew in 1915 and from that time until May, 1931, the partnership of Edwards & Walker continued in the same business without change of membership.

The exact amount of each partner's interest in the firm's assets and profits is not clear but it was shown by undisputable documentary proof that Edwards contributed all of the moneyed capital of the firm and that Edwards' drawings throughout the life of the firm were considerably larger than Walker's. On the other hand, it is likewise evident that Walkers' contributions to the firm were important and valuable. He had a large acquaintance and knowledge of the meat and produce business, and secured and controlled a large amount of the profitable business of the firm.

On the 25th day of May, 1931, articles of association of Edwards & Walker, Inc., respondent, were executed by Lawrence H. Edwards, John E. Walker and E. Raymond Walsh, and were filed in the office of the Secretary of State on May 26, 1931.

On May 27, 1931, a meeting of the incorporators was held at the home of Lawrence H. Edwards. There is a sharp dispute respecting the correctness of the minutes of this meeting but it is undisputed on all the oral testimony that at that meeting it was voted to issue 49 shares of non par stock to Lawrence H. Edwards, 49 shares of like character to John E. Walker, and two of such shares to E. Raymond Walsh. The transfer of the assets of the partnership to the corporation was made at the same time, Edwards and Walker executing a bill of sale of the assets of the partnership to the corporation. The instrument bears date of May 26th, 1931, but it is undisputed that this was a mistake, the actual execution being on May 27th, 1931.

On the evening of the day on which the meeting was held, Lawrence H. Edwards was taken to a hospital and on the next day underwent an operation for cancer of the rectum. He returned to his home during the following summer and died on December 11, 1931.

His wife, Merdie B. Edwards, the complainant, was appointed executrix of the will of Lawrence H. Edwards and under the will she is the sole and residuary legatee of her husband and holds, as executrix, 49 shares of the respondent corporation.

No further issues of stock have been made and Walker and Walsh hold certificates for 49 shares and 2 shares respectively.

The relief prayed is:

(A) Re-allotment of shares of stock between complainant and Walker, 60 for complainant and 40 for Walker.

This prayer is based on the alleged mental incompetency of Edwards and alleged undue influence exerted by Walker at the time the corporation was organized.

(B) That E. Raymond Walsh be declared to hold the shares of stock standing in his name as a trustee equally for complainant and Walker.

(C) Receivership and dissolution.

This is based on allegations of misconduct of the officers of the corporation; misapplication and wasting of assets.

I.

*Incompetency of Lawrence H. Edwards.*

The allegations in the bill relating to incompetency, summarized, are that at the time when the successive steps were taken in the organization of the corporation, that is, from the 25th day of May, 1931, to the 27th day of May, 1931, Lawrence H. Edwards was incompetent, because of his illness, to attend to business affairs and that, hence, there should be a redistribution of shares of the capital stock of the corporation to correspond to his actual intention, 60 shares to himself and 40 shares to Walker.

Edwards' health was noticeably impaired in the spring of 1931 after his return from an automobile trip in May of that year. On the advice of his family physician, he consulted a specialist, Dr. O'Connell. This was on Friday, May 22nd. He was advised that an operation, serious in its character, was necessary. He immediately began to prepare his business affairs to meet the contingencies which he apprehended might ensue. On the same day of the consultation with Dr. O'Connell, he conferred with Martin Royston, who was connected with one of the title companies in the city, in respect to the transfer of real estate to Mrs. Edwards.

He determined also to form a corporation to take over the business of the partnership and on Saturday, May 23rd, he arranged for a conference on Sunday with his partner, Walker. This conference took place and, as a result, an appointment was made for Monday at 4 o'clock at the office of E. Raymond Walsh in order to take the initial steps necessary to put the business in corporate form.

On Monday, May 25th, Edwards went to the office of the concern on Canal Street; attended to the transfer of two bank accounts to himself and wife jointly; executed the necessary papers to effect this; executed a deed transferring certain real estate to himself and his wife; at 4 o'clock went to the office of E. Raymond Walsh, where a conference took place with respect to the proposed incorporation of the business. Mr. Justice Walsh, E. Raymond Walsh, John E. Walker and Edwards were present.

The matter of distribution of the capital stock came up and Edwards remarked that he would like to have it 60-40. Walker said: "Why 60-40? We have always been 50-50," and Edwards responded: "That is right, and we always will be."

Articles of association were proposed at this meeting and were executed by Walker, Edwards and E. Raymond Walsh. All of the parties to this conference testify that Edwards' conduct and appearance were normal.

On Wednesday, May 27th, in the afternoon, Judge Walsh, E. Raymond Walsh and John E. Walker went to the home of Edwards, where a meeting of the incorporators was held. Judge Walsh was present at the request of Edwards. The ordinary routine of an organization meeting of a corporation was followed. Walker was chosen temporary chairman, E. Raymond Walsh temporary secretary; officers were elected and a resolution was passed accepting an offer to sell the assets of the partnership to the corporation in payment for 98 shares of stock and that 49 shares be issued to Walker, 49 shares to Edwards and that 2 shares be issued to E. Raymond

Walsh, ostensibly in payment for his services in organizing the corporation. All of the resolutions were moved by Edwards.

After the meeting, Edwards showed Judge Walsh and his brother around his home and grounds and accompanied them to the door when they left. It was the testimony of Mr. Justice Walsh, who knew Edwards well, that his mental attitude was normal, or, as he put it, "Absolutely nothing wrong with his mental condition."

Against this impressive array of facts showing important business transactions conducted by Edwards in an intelligent manner, we have the testimony of Mrs. Edwards and her sister, Merle Bahner. The testimony of both is much too long for a complete summary to be attempted. The principal points only can be emphasized. Mrs. Edwards, it may be remarked in considering her testimony, was a trained nurse before her marriage. According to her, immediately after the interview with Dr. O'Connell on May 23, 1931, her husband began to make arrangements in regard to his business and his property, in view of the approaching operation, and, at that time, he spoke of incorporating his business, and when discussing the intended incorporation and said: "I will give Johnny (John E. Walker) 40 shares and keep 60." This conversation was on May 23, 1931. The witness further stated that several times thereafter he spoke in a similar manner of the proposed division of shares. His condition at that time was characterized by Mrs. Edwards as morbid, suffering quite a little and much distressed; he was excited, could not sit down and could not eat. The witness gave the substance of a telephone conversation between Judge Walsh and Mrs. Edwards which is pertinent on the question of his mental condition

at that time. Edwards spoke to Judge Walsh of his desire to incorporate the business and that he desired Judge Walsh's advice on the matter.

Mrs. Edwards described her husband's condition during the following days and particularly on the evening following the conference at E. Raymond Walsh's office. On Monday, May 25, she said that he was restless, excitable, and nervous, and that he was "sort of erratic. He would ramble off if you talked to him. He would give you a logical answer sometimes but would ramble off at times." When pressed to describe this rambling attitude of mind, she said: "He would talk about different things and say 'What did I say?' * * * and he would sort of straighten the conversation out again and give you a logical answer." She further described him as being apprehensive of the result of the impending operation and as believing, as the witness expressed it, that "he was done for."

On the night before May 27, (the day of the organization meeting), the witness stated that Edwards was in great pain and was sleepless during the entire night. She testified as to meeting Judge Walsh, E. Raymond Walsh and John E. Walker when they came to the house in the afternoon, stating that she did not take part in the meeting on that day; that after the meeting Edwards was in the same condition as before the meeting; that business matters were not discussed between them after the meeting of the incorporators, and that he went to the hospital that same evening and was operated on the next day.

It is a significant fact, and pertinent on the question of Edwards competency, that Mrs. Edwards accompanied her husband to the business section of Providence on Monday, May 24, when he changed his deposits in two banks; that she made no protest against his business activities that day

and did not speak to any of the persons coming to the house on the 27th of May in regard to his mental condition, or state to them or to anyone that her husband was too ill or not fit to attend to business affairs.

Merle Bahner, a sister of the complainant, also a trained nurse, came to Providence on Sunday, May 24, 1931, and from Monday the 25th Mr. Edwards was in her care. Her testimony is quite similar to the testimony of Mrs. Edwards in its general scope. She described him during the period from May 24th to May 27th as restless, fearful of the future, despondent as to his chances for recovery, very depressed, morbid, and lacking in interest. "He did not act as though he was in a daze," she further said, "but I think I could describe it better when I say lacking interest. He appeared like a man who was very, very deep in thought." And again, "He would respond not unintelligibly. I don't recall a time when he did not reply intelligently. He was at times rather slow in answering, sort of dull of comprehension and he was rather slow;" and she further testified that "after May 24th, he was greatly depressed and wept often." He spoke to Miss Bahner in regard to his business affairs, his plans for the future, his bank accounts, the incorporation of his business and discussed such subjects with Miss Bahner in an intelligent fashion.

Other witnesses testified pro and con on the question of the mental capacity of Edwards, and such testimony has not been overlooked, but space forbids particular comments thereon.

Taking all of the testimony on the question of Edwards' competency to manage his business affairs during the period from May 22, 1931, to May 27, 1931, it appears from the facts in evidence, either undisputed or as shown by the weight of the evidence, that Edwards, in view of the serious operation which he was shortly to undergo, intelligently discussed with his wife, and planned and carried through intelligently, changes in his business affairs, including the incorporation of his business and the matter of the disposition of his savings deposits and transfer of real estate to his wife. He was preoccupied with these affairs during this interval and the evidence shows that he was apprehensive of the outcome of the operation and suffering pain during this period, but the Court cannot find from the testimony of the complainant, her sister or the other witnesses, that Edwards' mind was clouded or that his mental operations or conceptions were enfeebled or weakened during this period while he was attending to his business affairs.

There was considerable evidence that opiates were given Edwards during this period and much discussion of the effects of such opiates upon his mind, but there is nothing in the evidence to show that his mind was affected by the use of drugs when he was planning the incorporation of the business or when he was carrying such plans through in the organization of Edwards & Walker, Inc.

In attacking the allotment of shares as between Edwards and Walker, the complainant argues that Walker stood in a fiduciary relationship to Edwards and that he took advantage of his position and of Edwards' illness to obtain a greater interest in the corporation than he was entitled to. and that Edwards' real intent, as evidenced by his conversation both before and after the meeting of May 27, 1927, was for a division of the shares of the corporation between himself and Walker in the proportion of 60 and 40 respectively, but that he was prevented from carrying out his intent by the efforts of Walker.

It is true that Edwards, according to the testimony of Mrs. Edwards and Miss Bahner, expressed his intention of so dividing the interests in the proposed corporation and followed this up by a like statement at the meeting of May 25th, 1931, but it likewise appears that when Walker said that the allotment should be in equal shares, he promptly agreed to that division and that this agreement was carried out without hesitation or demur on his part on May 27th, when a resolution was passed on his own motion for the issue of 49 shares of stock to himself and 49 shares to Walker. On both occasions, Edwards' trusted adviser and friend, Mr. Justice Walsh, was present to guide him, and on neither occasion, nor on any other occasion, is there any evidence that Walker overbore Edwards by threats, coercion, or persuasion, or otherwise unduly influenced him. Edwards was competent to act and to make a free choice in disposing of his partnership interest, and did so.

On all the facts the Court finds that Lawrence H. Edwards was competent to act on business affairs during all the period from May 23, 1931, up to and including the time of the incorporation meeting on the 27th day of May, 1931, and that his agreement to allot the shares of stock in Edwards & Walker, Inc., on the basis of 49 shares to himself and 49 shares to Walker was freely entered into by him and that no undue influence was exercised by Walker over Edwards in respect to such agreement.

## II.

*The shares of E. Raymond Walsh.*

The claim here is that E. Raymond Walsh has no beneficial interest in the two shares of stock held by him.

The facts on this phase of the case are not disputed. E. Raymond Walsh represented the partnership of Edwards & Walker on one occasion in a minor matter previous to May, 1931.

Edwards, at the conference of May 25, 1931, desired Judge Walsh as an incorporator but when he declined to act, Edwards turned to E. Raymond Walsh and suggested that he act as an incorporator, and it was so agreed between Edwards and Walker. There was some further discussion in regard to issuing shares of stock to Walsh and it was finally determined by all present that two shares of stock be issued to E. Raymond Walsh, as it was stated, in payment of his bill for organizing the corporation. On the basis of the shares issued for the property of the partnership, these two shares at the time of organization of the corporation would have been worth about $1,000. No statement or bill was ever rendered the corporation by E. Raymond Walsh nor was any resolution of any form or character ever passed by the incorporators, board of directors or stockholders, setting any value on the stock so issued and at no place in the corporate records or books is there any such estimated value found recorded.

Mr. Walsh did not include the amount of stock as income in his Federal tax return. Although both Edwards and Walker withdrew considerable amounts from the corporation up to the time of Edwards' death in December, 1931, nothing whatever was paid to Mr. Walsh, nor does his name appear on any dividend sheet or drawing account, and it does not appear that he ever made any demand for dividends on the two shares held by him, and he never drew any salary or took any active part in the management of the corporation.

Some doubt as to the legality of the issue of stock to Walsh under the General Corporation Law, Ch. 248, Sec. 31, has been expressed but the point is not of practical importance since it is evident that Mrs. Edwards cannot attack the legality of such issue of

stock in this proceeding. Whatever her rights are, they come to her husband, Lawrence H. Edwards. It is clear on all the testimony that the two parties, who owned all of the assets of the partnership which were to go into the corporation, agreed to issue two shares of stock to E. Raymond Walsh. The complainant, therefore, is in such a position that she cannot attack the legality of the issue.

5 Fletcher, Corporations, p. 5913.

But Mrs. Edwards, although estopped to attack the legality of the issue to Walsh, is not debarred from exploring the exact nature of the agreement between the incorporators in respect to these two shares of stock. It is difficult to believe that either Edwards or Walker intended to transfer the right to almost $1,000 capital value in the corporation and the right to future earnings on this amount of capital stock in actual consideration of the legal services which were performed in organizing the corporation. These services, while important, were no more than are ordinarily performed when a small corporation is formed with an exceedingly simple capital structure and with few transfers necessary.

The inferences to be drawn from the undisputed facts are inescapable. It was not intended by any of the parties to the transaction that Walsh should have a beneficial interest in the stock. Edwards, in particular, desired his friend and former legal adviser to act as an incorporator and as a director and when that was found to be impossible, E. Raymond Walsh was selected to occupy these positions. To qualify him, it was evidently thought necessary to make him a stockholder, and to afford an ostensible legal basis for becoming a stockholder, it was suggested that the non par stock be issued on the basis of payment for legal services.

The Court finds that, at the time the stock was authorized to be issued, it was not intended by either Edwards or Walker to convey the beneficial interest to Walsh, nor was the resolution or agreement to issue such stock understood or accepted by Walsh as vesting in him the beneficial interest in the stock, and therefore rules that E. Raymond Walsh holds the two shares of stock in trust, one share in trust for Mrs. Edwards, the complainant, and one share in trust for John E. Walker.

### III.

#### Receivership.

The complainant prays that a receiver be appointed and that the corporation be dissolved on the ground that, by the negligence, misconduct and unfairness of the respondent John E. Walker, the estate and effects of the corporation are being misapplied and are in danger of being wasted and lost.

The pertinent provisions of Chap. 248, Sec. 57 (General Corporation Law) when brought together read:

"Whenever, by reason of fraud, negligence, misconduct * * * of the executive officers of any such corporation * * * the estate and effects of such corporation are being misapplied or are in danger of being wasted and lost, the Superior Court may, upon the petition of any stockholder, * * * decree a dissolution of such corporation and appoint a receiver of its estate and effects * * *."

During the entire life of the corporation, John E. Walker has been an officer thereof, acting as president. Since the death of Edwards, in December, 1931, Walker in effect has been in sole and absolute control of all the business affairs of the corporation and has directed its policies.

Some specific instances of misapplication of assets and of misconduct on the part of Walker are:

(1) *Payment of personal indebtedness.*

Walker charged to the corporation and caused to be paid from the corporation funds personal indebtedness for work done at his own home, amounting to $100. It is true this amount was repaid by Walker, but five months later and at a time when Walker's mismanagement of the corporation was under a sharp attack by Mrs. Edwards.

(2) *Pay-roll and special deposit.*

Previous to the death of Edwards and from the time the corporation was organized, both Edwards and Walker drew a salary of $100 a week. Edwards died on the 11th of December, 1931, and a few days later Mrs. Edwards received $100 which was due for the week in which Edwards died. Thereafter, Mrs. Edwards was not paid the sum of $100 but the amount of $100 was, nevertheless, withdrawn from the corporate funds as a part of the payroll and this amount was handed to Walker, who claims he deposited the sum of $100 each week in the safe at the office. Somewhat later, Barry, the bookkeeper, was instructed to set up a sinking fund and carry the amount of $100 drawn each week under that entry, and still later a secret deposit of accrued payments was made in the Washington Park Branch of the Industrial Trust Company under the name of Edwards & Walker, Inc., John E. Walker, President. The deposit was of $1,900, finally reaching the sum of about $3,000. This deposit was not carried on the books of the corporation and Walker kept the bank book in his pocket. It was not until suit was brought and production of the books ordered that the deposit was placed in the general account of the corporation and the amount entered on the books. On all these facts this transaction cannot be regarded other than an attempt to conceal assets of the company to a relatively large amount from the knowledge of the complainant.

(3) *Edson account.*

On May 23, 1932, Walker loaned to Nelson H. Edson $450 from the corporate funds. According to the testimony of both Edson and Walker, Edson was to repay the loan when able to do so but no note or written memorandum evidenced the transaction and the item was carried on the corporation books under bills receivable. Security in the shape of a diamond ring was given, but this transaction does not appear by any entry on the books. The loan stood at the time of trial at $453. This obviously was an ultra vires transaction and a misapplication of assets and is not justified by the plea that both Edwards and Walker earlier had loaned money to another individual.

There is another aspect of the Edson affair that demands attention. Edson bought meat and produce from packers on the credit of Edwards & Walker, Inc., the bills being made out to that firm. Edson sold the commodities so purchased to his own customers and was credited with the difference between the cost and the sale price. The expense of handling and the overhead were assumed by the corporation without consideration so far as appears. Up to the time of the trial, Edson had drawn some $700 as his profit in the transaction and the debt of $450 still remained unpaid.

The Edson transactions, apart from the loan (in Accounts Receivable), were not entered in the regular books of the corporation but were kept in a separate book. An audit of the books of the company, unless Walker saw fit to disclose this separate account, would not reveal the transactions whereby the company was rendering this credit to Edson and assuming the overhead and the handling charges.

Some attempt is made to justify the transactions on the ground that the debt of $450 was to be repaid from the profits made by Edson and that in time the customers of Edson would become the customers of the corporation. It is enough to say that the history of the transactions up to the time of the hearing did not disclose any attempt to pay the loan in this manner. Whether or not Edson's customers will ever become the customers of the firm is a matter too speculative for judicial consideration.

(4) *Shipments to Raymond Walker.*

A large number of shipments of meat and other commodities in which Edwards & Walker, Inc., dealt were sent to Walker's son, Raymond Walker, who resided in New Jersey. No charge slips of these shipments were made out, nor were any entries made on the books of the concern reflecting these transactions. The exact number of shipments, or the value thereof, is not revealed clearly.

The Court finds that these shipments were not paid for either by John E. Walker or by Raymond Walker and that the corporation has never received the value thereof.

(5) *Christie Diner.*

Much the same situation existed in respect to shipments to the Christie Diner. It was operated by a brother of one Foley who was in charge of shipping orders at Edwards & Walker, Inc. No charge slips were ever made out representing these shipments and the account was never entered in the books of the corporation. Foley, in his testimony on the stand, asseverated that the account was fully paid, but there is no sufficient proof of this and the Court finds that the corporation never received payment for the goods so shipped to the Christie Diner, and that Walker knew of this course of conduct.

The Court, on all the evidence, finds that by reason of the misconduct of the respondent Walker as executive officer of Edwards & Walker, Inc., the estate and effects of such corporation have been and are being misapplied.

It may be pertinent in this respect to find, and the Court does find that the amount of the assets, estate and effects which have been and are being misapplied is substantial when the amount of the property and the size of the income of the corporation are taken into account.

Are the estate and effects of the corporation in danger of being wasted and lost?

The answer must be in the affirmative. The attitude of Walker is important on this question. The record is replete with evidence showing a state of hostility, without justification on Walker's part, toward the complainant. It appears from the death of Edwards that Walker attempted to prevent any participation by Mrs. Edwards in the affairs of the corporation, although she was the holder of stock of an equal amount with him; that he gave her information of the financial condition of the corporation only under pressure, and his attempts to conceal assets in a subtantial amount from her knowledge has already been considered, as well as some of the more important of his acts of misconduct in the management of the corporation. These facts, when taken together, demonstrate that the assets of the corporation are in danger of being wasted and lost under the management of the respondent Walker.

Counsel for the respondent Walker has argued, citing many cases, to the effect that the remedy of a receivership is so drastic that the Court is not justified on the facts in applying such a remedy, but suggests that by the remedy of injunction the respond-

ent Walker can be prevented from further misconduct and the rights of the complainant protected.

It seems quite clear that the affairs of this corporation cannot be run successfully with continuous applications to this Court for injunctive process against Walker. His attitude is such as to make it impossible for this Court in reason to find that the management of the corporation will be any different in effect than what it has been in the past since the death of Edwards.

The controlling statute was designed to protect the property rights of stockholders in a corporation and when acts of the character found to exist in this case have been committed by an officer of such corporation, with the attitude of mind displayed by the respondent Walker toward the complainant, the Court is well within its discretion in appointing a receiver.

A case for relief under the statute has been made out and it appears both that the estate and effects of the corporation are being misapplied and that the assets are in danger of being wasted.

The prayer of the bill that a receiver may be appointed and the prayer for dissolution of the corporation are granted.

A decree in conformity with the findings of fact and the rulings of law in this rescript may be presented.

For complainant: Edwards & Angell.

For respondent: Walter J. Hennessey.